### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC, | : | |
| DENNIS SMITH, | : | DKT No.: 1:23-cv-00773-DHU-LF |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELLE LUJAN GRISHAM, | : | |
| in her official capacity only, PATRICK | : | |
| M. ALLEN, in his official capacity only, | : | |
| JASON R. BOWIE, in his official | : | |
| capacity only, TROY WEISLER, in his | : | |
| official capacity only, HAROLD | : | |
| MEDINA, in his official capacity only, | : | |
| | : | |
| Defendants. | : | October 9, 2023 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' THIRD EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION

As Court and counsel noted at the preliminary injunction hearing on October 3, 2023, the Defendants needed to extend the orders that this action challenges before their expiration. Governor Grisham and Defendant Allen acted as the Court and counsel indicated. Late on Friday, October 6, 2023, Governor Grisham issued Executive Order 2023-135 declaring gun violence to be an emergency in the state of New Mexico. **Exhibit D.** Defendant Allen and Governor Grisham then issued an amended public health order that same day that superseded the prior ones that were the subject of the Plaintiffs' first and second motions for preliminary injunctions. **Exhibit C.**

Much has changed in the Defendants' new orders. They still ban the public carrying of firearms (open or concealed) at public parks and playgrounds in the City of Albuquerque and Bernalillo County. *Id.* at § 1. The order, however, does attempt to

1

address the concerns that the Court noted with respect to how vague the terms of the second batch of orders were. It eliminates the second order's inclusion of public places where children might play. *Id*. at § 1. The order permits the carrying of firearms in "the City of Albuquerque's Shooting Range park and areas designated as a state park within the state parks system and owned or managed by the New Mexico Energy, Minerals and Natural Resources Department State parks Division, or the State Land Office." *Id*. at § 1.

The amended public health order necessitates this new filing – particularly since the Defendants chose to issue the orders late on October 6, 2023, which was the deadline that the Court gave the Plaintiffs to file any supplemental documents.

The amended public health order suffers from the same defects as the first two did.  the Defendants have made absolutely no effort to justify it under any of the exceptions to the Second Amendment's guarantee of a right to public carry that the United States Supreme Court recognized in *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2134 (2022). Instead, the Defendants continue to restrict the Plaintiffs' Second Amendment rights to carry firearms in the places where the Plaintiffs need firearms the most to protect themselves and their families based on an emotional reaction to three tragic homicides in New Mexico. The Defendants' failure to offer any rationale as to how their order is constitutional in view of *Bruen* requires the Court to speedily restrain it.

## **FACTUAL BACKGROUND**

New Mexico has seen several isolated incidents of shootings over the last six weeks. On July 28, 2023, a 14-year-old boy obtained a pistol due a homeowner's alleged

negligence in storing it and shot a 13-year-old girl in Questa, New Mexico while they both were hanging out with friends. Dkt. 1, ¶ 16. On August 14, 2023, a criminal attempting a drive-by shooting of another individual shot and killed a 5-year-old girl at a trailer park in Albuquerque. *Id*. at ¶ 17. On September 6, 2023, a criminal shot and murdered an eleven-year-old boy in what appears to be a road rage incident. *Id*. at ¶ 18. Additionally, a mentally disturbed teenager – Beau Wilson – killed three people in Farmington, New Mexico on May 15, 2023 when he randomly walked through a neighborhood shooting at homes and drivers after he allegedly struggled to cope with his parents' divorce and being removed from his school's varsity wrestling team. *Id*. at ¶ 19.

Citing these incidents to declare "gun violence" a public health emergency, Defendants Grisham and Allen collectively issued executive and administrative orders banning the public carry of firearms in public parks across New Mexico and in cities and counties that meet certain statistics – effective immediately. *Id*. at ¶¶ 20-22. Albuquerque, New Mexico met the statistical markers established by these orders. *Id*. at ¶ 24.

Plaintiff Dennis Smith is a law-abiding citizen who has lived in Albuquerque for approximately 40 years. **Exhibit A, ¶ 3**. His age renders it impossible for him to outrun or overpower a criminal who attacks him or his loved ones. *Id*. at ¶ 5. Thus, he has held a New Mexico concealed carry permit for approximately 6 years, and he meets all of the federal and state requirements to lawfully obtain, possess, and carry firearms. *Id*. at ¶ 4.

Smith regularly carries a loaded handgun in a holster on his body for the purpose of self-defense whenever he leaves his home and when he is out in public in Albuquerque. *Id*. at ¶ 6. Additionally, Smith carries his handgun when he engages in recreation weekly

at New Mexico public parks – primarily Los Poblanos Open Space – to protect himself from wild coyotes, stray dogs, and potential human attackers. *Id*. at ¶ 8. Finally, when Smith takes his grandchildren to public playgrounds in the City of Albuquerque, he carries his handgun to those places to protect himself and his children. *Id*. at ¶¶ 9-11.

Despite the Defendants' orders and conduct, Smith still intends to carry his handgun in public within the City of Albuquerque as well as Los Poblanos Open Spaces. *Id*. at ¶ 11. If he does, New Mexico law exposes him to civil penalties up to $5,000 per violation of the Defendants' orders. New Mexico Stat. § 12-10A-19. Penalties in that amount would exceed Smith's financial means. **Exhibit A, ¶ 11**.

Plaintiff We The Patriots USA, Inc. – of whom Smith is a member and supporter – joins Smith's claims on behalf of its similarly situated New Mexico members. Dkt. 1, ¶¶ 8-9.

The Plaintiffs moved for emergency injunctive relief on September 9, 2023. Dkt. 3. After a hearing on September 13, 2023, the Court granted a temporary restraining order enjoining the Defendants from enforcing certain provisions of their September 8, 2023 public health order. Dkt. 11.

On September 15, 2023, Defendants Grisham and Allen amended the public health order in response to the Court's order. **Exhibit B**. The amended public health order prohibits the carrying of firearms – openly or concealed – "in public parks or playgrounds, or other public area[s] provided for children to play in…" in Albuquerque, New Mexico. *Id*. at p. 2, § 1. This definition, however, exempted areas designated as state parks. *Id*. at p. 2, § 1.

On October 6, 2023, Defendants Grisham and Allen amended the public health order in response to questions posed by the Court at the October 3, 2023 preliminary injunction hearing. **Exhibit C**. The amended public health order bans the public carrying of firearms (open or concealed) at public parks and playgrounds in the City of Albuquerque and Bernalillo County. *Id*. at § 1.

## LEGAL STANDARD

The Court may grant a temporary restraining order or a preliminary injunction or a preliminary injunction if the moving party shows "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest." *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1542-42 (10th Cir. 1994) (internal citations omitted.

## ARGUMENT

I.    **The Plaintiffs Demonstrate A Substantial Likelihood Of Prevailing On The Merits.**

   **A. The Defendants' Amended Orders Do Not Regulate "Sensitive Places" And Violate The Second And Fourteenth Amendments.**

The Defendants' initial orders completely deprived the law-abiding citizens of Albuquerque and the Plaintiffs of their Second and Fourth Amendment right to carry firearms for the purpose of self-defense throughout the entire city, and the Defendants' amended orders do little to narrow that definition. The Defendants' amended orders still defy the plain text of the Second Amendment and *Bruen*. For those reasons, the Plaintiffs

demonstrate a substantial likelihood of success on the merits of their challenge to the public carry provision of the Defendants orders.

*Bruen* establishes a two-part test for analyzing Second Amendment claims. The Plaintiffs must first demonstrate that "the Second Amendment's plain text covers [their] conduct." *Bruen*, 142 S.Ct. at 2129-30. If they carry that burden, "the Constitution presumptively protects that conduct." *Id*. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. at 2130 (internal quotation marks and citations omitted).

The Plaintiffs carry their textual burden. As in *Bruen*, there is no meaningful dispute that Smith and We The Patriots USA's members – "ordinary, law-abiding citizens" – are part of the people whom the Second Amendment protects. *Id*. at 2134. Nor is there any dispute that "handguns are weapons 'in common use' today for self-defense." *Id*. The definition of "bear" in the Second Amendment "naturally encompasses public carry." *Id*. at 2134-35. Thus, as the Supreme Court concluded in *Bruen*, the Second Amendment's plain text presumptively guarantees the Plaintiffs a right to "bear" arms in public for self-defense just as they have done peacefully and lawfully for many years. *Id*. at 2135.

The burden now shifts to the Defendants to demonstrate that their orders and conduct are consistent with the historical tradition of firearm regulation. The Plaintiffs do not dispute that there is a well-established and representative historical analogue that permits states to prohibit the possession and carrying of firearms in "sensitive places."

6

*See Bruen*, 142 S.Ct. at 2133. The Defendants cannot prevail in that inquiry though as to public parks, playgrounds, and other public areas provided for children to play in.

A key principle from *Bruen* governs at the outset. *Bruen* completely forecloses any argument that any place can be a "sensitive place" simply because many people congregate there and law enforcement is presumptively available. [1] *Id*. at 2134-35 ("Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").

Although the Supreme Court declined to "comprehensively define 'sensitive places'" in *Bruen*, it did not leave courts without any guidance. In *Bruen*, New York proposed a definition of "sensitive places" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 2133 (quoting New York's brief) (internal quotation marks and citations omitted). *Bruen* rejected this definition as being far too broad and being without a historical basis. *Id*. at 2134. It also found that such a definition "would in effect

---

[1] Even if it was, the right to self-defense takes on additional importance in light of *Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) and *Town of Castle Rock, Colo. V. Gonzales*, 545 U.S. 748 (2005). *Deshaney* and *Castle Rock* unequivocally establish that law enforcement and government officials have no obligation "to protect the life, liberty, and property of [their citizens] against invasion by private actors." *Deshaney*, 489 U.S. at 195; *Castle Rock*, 545 U.S. 748 (holding that the Fourteenth Amendment does not require police officers to enforce the law or arrest someone who violates the law). In other words, even the presence of law enforcement officers does not guarantee their safety or that law enforcement officers will act to protect them when they are the potential victims of a violent crime.

exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense…."*Id.* at 2134.

Instead, the Supreme Court recognized that the 18th and 19th-century historical record yielded few places where governments banned the possession of weapons. *Bruen*, 142 S.Ct. at 2133 (listing "legislative assemblies, polling places, and courthouses" as "sensitive places"). Thus, *Bruen* instructed courts to use "analogies" to these "historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*. at 2133 (emphasis in original).

Public parks and playgrounds for children do not even remotely resemble the well-established historical "sensitive places" analogues *Bruen* cites. Those analogues shared a common feature. They only covered places where the core functions of government or self-government took place. Core government functions do not take place in public parks, playgrounds, and play areas for children. Virtually every government in the United States has established a central building or location in which to conduct its core functions. That includes the federal capitol, the state capitals, federal and state legislative buildings, municipal city and town halls, and courthouses. Conversely, public parks and playgrounds – open to the public for recreation – are the furthest thing imaginable from a place where core government functions take place.

1. **The American historical tradition of "sensitive places" were rare and typically covered places where the core functions of government took place.**

The "sensitive places" doctrine lacks a clear historical starting point. The Supreme Court has rightfully cautioned that medieval history is ill-suited for interpreting the Second Amendment. *See Bruen*, 142 S.Ct. at 2139. The Plaintiffs concede nothing though by acknowledging that ancient history informs the historical tradition of "sensitive places." The Founding Fathers rejected ancient history and even colonial history as being too weak in formulating the Second Amendment though. Thus, the United States' "sensitive places" doctrine is informed, but not controlled, by pre-Founding Era history.

Marcus Tullus Cicero provided a timeless example of the need for a "sensitive places" doctrine. Titus Annius Milo selected Cicero – one of Rome's greatest orators – to deliver his closing argument to a jury stacked by his political opponents when he faced trial for murdering a political rival, Publius Clodius Pulcher. While Cicero's Milo Oration stands as one of the greatest defenses of the principle of self-defense in human history, Cicero himself never gave the oration at Milo's trial due to armed intimidation from Clodius' friends. Marcus Tullius Cicero, Speech in Defence of Titus Annius Milo (52 B.C.), in 3 ORATIONS OF MARCUS TULLIUS CICERO 204-05 (Charles Duke Yonge trans., rev. ed. 1899). The stacked jury convicted Milo, and the tribunal exiled him. Cicero's prominence as a Roman legal thinker endured though, and his work influenced much of

western legal thought. Thus, it is no stretch to say that the context of the Milo oration influenced western thought pertaining to the "sensitive places" doctrine.[2]

Medieval English regulations addressed the same problem that Cicero encountered in the Milo trial. In 1313, the English Parliament took steps to protect legislative assemblies, enacting a statute that provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably." 7 Edw. 2, 170 (1313). Later, the 1328 Statute of Northampton ("the Statute") provided protections to the King's ministers and officers, including the English Courts. The Statute came into being during a time of turmoil. *Bruen*, 142 S.Ct. at 2139. After Edward II was deposed by force and Edward III took the throne, England descended into a state of anarchy and rebellion, and knights and commoners alike ravaged the land in a general "spirit of insubordination." *Id*. The Statute sought to restore order and respect for royal authority by prohibiting Englishmen from coming

> before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring[ing] no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.

---

[2] The Supreme Court has held that chaos that falls far short of the armed intimidation present in the Milo trial violates a criminal defendant's due process right to a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 336 (1966). *Sheppard* plainly establishes that the need to protect core government functions by treating the places in which critical government business is conducted as "sensitive" is not simply limited to weapons and armed intimidation of participants. Instead, the free and just operation of core government functions depends on an orderly environment and the preclusion of chaos.

*Id*. at 2139 (quoting 2 Edw. 3 c. 3 (1328).

While *Bruen* held that the Statute has little bearing on the modern interpretation of the Second Amendment, *id*. at 2139-2142, the Statute still builds upon the Milo trial example as one of the earliest examples of a "sensitive places" regulation and its policy goal to ensure the unfettered operation of core government functions.

*Bruen*'s caution as to the Statute is well-placed. From the earliest days of English colonies in America, the American colonial tradition of the right to bear arms broke radically from their English counterparts. It began when King James I issued the English-speaking-world's first written guarantee of a right to obtain, keep, and bear arms in the 1606 Virginia Charter. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229 (2018). The 1620 New England Charter carried an identical guarantee. *Id*. at 229-30. Since the geographical scope of these charters covered the entire area of the original thirteen American States, the early colonists enjoyed a greater right to bear arms than their English counterparts did. *Id*. at 230.

The American tradition not only contained a right to obtain, keep, and bear arms, but the colonial record is replete with compulsory possession laws mandating that men bring their arms to churches and public meetings.[3]

---

[3] *See, e.g.,* 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (1808) (1632 Virginia statute providing that "ALL men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1632 Virginia statute providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.* (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one

Restrictions on the places where firearms could be carried in the colonial and Founding Eras were few and far between. For instance, not even the classification of legislatures as "sensitive places" appears to have a firm foundation in colonial and Founding Era regulations. Maryland and Delaware were the only two colonies and states that prohibited the carrying of arms into legislative assemblies. *See* 1647 Md. Laws 216 ("[N]oe one shall come into the howse of Assembly (whilst the howse is sett) with any weapon upon perill of such fine or censure as the howse shall thinke fit"); 1650 Md. Laws 273 ("That none shall come into eyther of the houses whilst they are sett, with any gun or weapon upon perill of such fine or censure as the howses shall thinke fit." "Orders made & agreed vppon by the Assembly for the better ordering of Both Howses"); DEL. CONST, art. 28 (1776). The United States Congress did not prohibit the carrying of arms in both houses, and Representative Preston Brook's historical beating of anti-slavery Senator Charles Sumner did not culminate in just the near-death of Senator Sumner. Brooks then threatened Representative Calvin Chaffee who responded by buying a revolver and openly displaying it on his desk in the House to the approbation of his colleagues. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235 n.112 (2018).

---

fixed and serviceable gun with sufficient powder and shott"); 2 *id.* at 126 (similar 1676 Virginia law); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."); 19 (part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 137-40 (Allen D. Candler ed., 1904) (1770 Georgia statute imposing fines on militiamen who went to church unarmed). See *also* JOHNSON ET AL., *supra* note 1, at 183-85 (Connecticut, Massachusetts Bay, Maryland, South Carolina).

While the Plaintiffs do not challenge prohibitions on the carrying of arms in legislative buildings and no decision issued by this Court or any other court on the merits of his case will cast doubt on the legislative prohibitions common today, they submit this example to show just how different the American tradition of what were considered "sensitive places" was from its English antecedent. The laws and regulations that they discuss above were the only "sensitive places" regulations in the colonial and Founding Eras. Thus, assuming *arguendo* Maryland's and Delaware's regulations could supply a well-established and representative historical analogue for any sort of regulation,[4] they would only supply that analogue for buildings where core government functions took place – legislative assemblies, courts, executive buildings, and polling places. They do not supply a well-established and representative historical analogue for other places.

Reconstruction Era history also does not supply a well-established and representative historical analogue for a broader definition. The former Confederate states entered a state of chaos similar to that addressed by the Statute of Northampton. *Bruen*, 142 S.Ct. at 2152-53; *see also McDonald v. City of Chicago, Ill*. 561 U.S. 742, 772 (2010). Both *Bruen* and *McDonald* emphasized evidence submitted in the Congressional record that showed armed bands of former Confederate soldiers perpetrating all sorts of violent outrages on the newly free blacks and Southern states' efforts to disarm blacks to leave them at the mercy of these bands. *Bruen*, 142 S.Ct. at 2152-53; *McDonald*, 561 U.S. at 772. Congress's regulatory response was to take emphatic steps to protect blacks' right

---

[4] *Bruen* requires more than isolated examples. *See Bruen*, 142 S.Ct. at 2153 (requiring more than a single statute and a pair of state-court decisions to justify New York's regulation).

to bear arms through the Freedmen's Bureau and the Fourteenth Amendment. *Bruen*, 142 S.Ct. at 2151.

The former Confederate states who chose to regulate these ravages functionally enacted "sensitive place" laws although they usually took the form of "time" restrictions rather than "sensitive places" regulations. In 1870, Louisiana prohibited people from carrying arms in public at all on election day and within half a mile of a voter registration place. 1870 La. Acts 159-60.

Maryland focused on regulating two problematic counties. In 1874, it banned the carrying of weapons on election day in Kent County. 2 PUBLIC LOCAL LAWS OF MARYLAND, ARTICLES 11-24, at 1457 (King Bros, ed. 1888). In 1886, it banned the carrying of arms within 300 yards of polling places on election day in Calvert County. 1886 Md. Laws 315. In 1873, Texas prohibited the carrying of weapons within half a mile of a polling place during election hours. 2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, CAREFULLY ANNOTATED 1317-18 (4th ed. 1874).

These regulations, sounding in the "sensitive places" doctrine, received their first judicial endorsement in 1874 when the Georgia Supreme Court upheld a statute prohibiting the carrying of weapons into a court. *State v. Hill*, 53 Ga. 472 (1874). Without citing Cicero's Milo example or the Statute of Northampton, the Georgia Supreme Court ensured that a similar situation would not happen in its courts in no uncertain terms:

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of

justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

*Id*. at 477-78.

While it is true that other states in the Reconstruction Era attempted broad classifications of "sensitive places," those classifications escaped Second Amendment review by virtue of the Supreme Court's decision in *United States v. Cruikshank*, 92 U.S. 542 (1875), which declined to incorporate the Bill of Rights against the states. For instance, in 1869, Tennessee prohibited the carrying of pistols and various other dangerous or deadly weapons to polling places and "any fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858: BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE 108 (2d ed. Supp. 1872). It never received judicial review.

Texas enacted several laws that at least partially attempted "sensitive places" regulation. In 1870, it banned the carrying of firearms at election places, "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly," churches, schools, and private social events. 1870 Tex. Laws 63.

Broad laws of both the Tennessee and Texas vintage, however, carry both First and Second Amendment implications due to their broad coverage of private gatherings. Since these sorts of laws did not become subject to Second Amendment scrutiny until 2010 by way of *McDonald v. City of Chicago, Ill*. 561 U.S. 742 (2010), they provide little support for a broad "sensitive places" exception to the Second Amendment.

The laws of two states also falls far short of the well-established and representative historical analogue *Bruen* requires. *See Bruen*, 142 S.Ct. at 2155-56 & n. 31 (rejecting New York argument that Kansas and Arkansas's laws banning public carry in certain instances supplied the necessary historical analogue because two states' laws did not "demonstrate a broad tradition of States doing so).

Thus, at best, the historical record supports a conclusion that places where the core functions of government and self-government took place were "sensitive" because the survival of the United States as a constitutional republic depended on free expression and unfettered access to justice. Thus, historical laws properly protected voting, legislative debate, and courts of law in a manner consistent with the Second Amendment. They, however, did not grant states broad authority to declare virtually any area a sensitive place. *Bruen*, 142 S.Ct. at 2133. Thus, this limited "sensitive places" tradition favors the Plaintiffs' argument that public parks and playgrounds cannot be declared "sensitive places."

> **2. The modern addition of schools as a "sensitive places" exception is a narrow one that comports with the "core government functions" definition and does not justify a broader definition.**

Like the "sensitive place" restrictions discussed above, colonial and Founding Era history and tradition does not supply many examples of blanket prohibitions on carrying firearms in schools. It, however, does supply ample evidence that public schools were places where a core government function occurred, supporting the Plaintiffs' contention that their modern addition to the "sensitive places" doctrine does not expand the definition of "sensitive places" but confirms the "core government function" standard.

The historical record of arms prohibitions at American schools begins in 1824 at the University of Virginia. Founded by Thomas Jefferson and others, the student body soon gave Jefferson and his fellow members of the Board of Visitors, including James Madison, much grief by rioting, carousing, firing guns in the air, and shooting at each other. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 249-50 (2018). The Board responded by banning students, but not faculty or other employees, from keeping or carrying weapons on campus. *Id*.

In 1878, Missouri prohibited students from carrying concealed weapons at any university, college, or school. *See* 1878 Miss. Laws 176. Its prohibition, however, did not prohibit students from openly carrying weapons, and it did not prohibit faculty members or staff employees from carrying concealed weapons. *Id*. As discussed previously, Texas banned the carrying of arms to schools in 1870, similar to modern school regulations. 1870 Tex. Laws 63. The historical record, however, is bare of widespread examples of prohibiting firearm possession in schools.

The lack of specific historical examples does not doom the classification of schools as "sensitive places" though if they can properly be said to be carrying out a core government function. The historical record provides ample historical support for the principle that schools carry out core government functions. *See, e.g.*, *Horton v. Meskill*, 172 Conn. 615, 647 (1977) (discussing Connecticut's 1650 laws requiring every township to hire a schoolmaster). Because education became a state duty, public schoolhouses became places where core government functions are carried out – either by state or

municipal governments. Thus, their classification as "sensitive places" comfortably meets the definition of "sensitive places" as places where core government functions occur, and their addition to the modern doctrine of "sensitive places" does not support a definition for "sensitive places" broader than the "core government function" definition.

> ### 3. Prohibitions on carrying firearms in public parks did not surface until well after the adoption of the Second Amendment and did not become commonplace until well after the Civil War.

Public parks, public places of recreation, and their forerunners have existed well before modern public parks. In colonial times, village greens, commons, gardens, and squares constituted colonial forerunners to modern public parks. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 14 (2021) ("Today's American public park is deeply rooted in the seventeenth- and eighteenth-century utilitarian village green, common, square, and parade ground"). Those colonial forerunners claim parks that still exist today such as the Boston Common, Bowling Green Park, and Battery Park. *Koons v. Platkin*, 2023 WL 3478604, at *83 (D. NJ 2023) (listing examples). None of these early forerunners of modern public parks and places of recreation imposed a prohibition on the carrying of firearms within their confines. *Id.* (granting a preliminary injunction as to a carry ban at public parks).

Instead, the earliest bans on carrying firearms in public parks came between 1858 and 1872 in large municipalities. *See e.g.*, *Minutes of Proceedings of the Board of Commissioners of the Central Park*, at 166 (1858); *First Annual Report of the Commissioners of Fairmont Park*, § 21 (1870). These bans came well after the adoption

of the Second Amendment, and the Supreme Court's failure to incorporate the Second Amendment against state and local governments until 2010 meant that they went unchallenged. Additionally, two other district courts have found that the local park ordinances up until 1890 governed less than 10% of the nation's entire population and were unrepresentative within the meaning of *Bruen*. *Koons*, 2023 WL 3478604, at * 85; *Antonyuk v. Hochul*, 2022 WL 16744700, at *67 (N.D.N.Y. 2022).

The lack of widespread historical evidence – especially before and immediately after the Founding Era – is fatal to any attempt to justify bans on carrying in public parks under the "sensitive places" doctrine. The Court should join the *Koons* and *Antonyuk* courts in rejecting such arguments, and it should enjoin the Defendants' ban on carrying in New Mexico's public parks and playgrounds.

## II.   The Plaintiffs Demonstrate Irreparable Harm In The Absence Of A Temporary Restraining Order And A Preliminary Injunction.

Plaintiffs demonstrate irreparable harm "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). The Plaintiffs carry their burden on this prong.

As discussed above, the Second and Fourteenth Amendments guarantee a right to publicly carry firearms for lawful purposes. The Defendants have issued orders that completely bar the Plaintiffs from exercising those rights in New Mexico public parks and playgrounds in violation of the Second and Fourteenth Amendments for the next 30 days. Their injury is thus immediate and ongoing. *See Elrod v. Burns* 427 U.S. 347, 373 (1976) (establishing a presumption of harm for the loss of constitutional freedoms).

19

Plaintiff Smith, however, still intends to exercise his rights despite the Defendants' orders. If he does, he and other similarly situated members of We The Patriots USA, Inc. will face crippling financial sanctions, arrest, and criminal prosecution. **Exhibit A, ¶ 12**. In other words, the collective burden of the Defendants' enforcement of their unconstitutional orders will speedily end Smith's determination to exercise his Second Amendment rights.

Monetary damages would constitute an inadequate remedy and would be extremely difficult to ascertain. The very essence and value of a constitutional right is the ability to exercise it uninhibited within the constitutionally permissible bounds established by law, not executive fiat. Thus, a day where the Plaintiffs cannot exercise their constitutional rights without violating the law or exposing themselves to crippling financial sanctions is a day lost to them forever. No amount of money cannot adequately compensate them for days where they could not exercise their constitutional rights. More importantly, monetary damages would be completely unavailable as to the Defendants if the Plaintiffs suffered death or serious injury at the hands of a gun-wielding criminal while the Defendants barred them from lawfully carrying firearms.

Additionally, there is no way to reliably determine what monetary damages to award the Plaintiffs for the loss of their constitutional rights. A jury would simply have to pull a number out of their hats, and that number could be astronomically high or nominal depending on their sympathies. Thus, the Court should conclude that the Plaintiffs have demonstrated irreparable harm.

**III.    The Plaintiffs Demonstrate That The Threatened Harm Outweighs Any Damage That The Injunction May Cause To The Party Opposing It.**

The Defendants will suffer no damage by the granting of a temporary restraining order or a preliminary injunction. Prior to the Defendants' issuance of their orders, Smith and other similarly situated, law-abiding New Mexico citizens carried their firearms regularly in public parks and playgrounds. They represented no threat to public safety or the public health then, and nothing about their conduct has changed to render them a threat to public safety now.

Additionally, nothing about their behavior will change in the next 30 days to render them more responsible to carry firearms in public. No important public health goals will be served by prohibiting law-abiding citizens from exercising their Second Amendment rights in a law-abiding manner.

The Defendants' amended order also opens fire on its own logic. It still permits the Plaintiffs to carry their firearms in state parks, playgrounds, and other areas where children play outside the City of Albuquerque and Bernalillo County. If these locations truly were "sensitive places," the Defendants' failure to extent their order to those locations outside the City of Albuquerque and Bernalillo County is baffling.

The Defendants have grounded their rationale for issuing their orders in nothing extraordinary. Crime happens. While the loss of any life is tragic, the Defendants' reliance on three isolated shootings – the result of criminal conduct – does not establish a broader societal problem that imperils New Mexico citizens as a community. Every city and state in the United States experience shootings and murders, but they still permit their law-

abiding citizens to bear arms just as New Mexico did until the Defendants reacted emotionally and unilaterally.

The problems that the Defendants seek to address will not disappear as long as human beings coexist in communities. As discussed at length above, the Supreme Court has already recognized these problems, but it has affirmed the superseding importance of the right to publicly carry firearms. Thus, the Court's issuance of emergency injunctive relief will not cause any harm to the Defendants who will simply be returned to the same circumstances that every state and city in the United States exists in.

## IV.   The Plaintiffs Demonstrate That The Injunction Will Not Be Adverse To The Public Interest.

*Bruen*'s plain language controls the final factor in the temporary restraining order/preliminary injunction analysis: "The Second Amendment is the very *product* of an interest balancing by the people, and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal quotation marks and citations omitted, emphasis in original). Thus, "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Id*. This language alone is dispositive of this factor. Thus, the Second Amendment's protection of a right to public carry supersedes the interests that the Defendants have relied on in banning it.

There is more to the analysis though. The Defendants do not act under the color of a duly enacted state law or legislative action. They amended their ban late at night when the courts closed their doors for business, and they thought no one would pay heed to their actions. They solicited no public comment, and they completely disregarded any

22

constitutional limitations on their conduct. In other words, the Defendants' conduct does not carry the weight of a carefully calculated legislative judgment, but rather the emptiness of a panicked late-night decision to impose an absolute deprivation of a constitutional right on countless law-abiding New Mexico citizens.

Thus, the absence of any carefully articulated public interest and the strength of the Second Amendment's interest balancing leads to one conclusion: The public interest favors the issuance of immediate, ex-parte injunctive relief.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that the Court issue an emergency ex-parte temporary restraining order barring the enforcement of the public carry bans in public parks, playgrounds, and other areas provided for children to play in and speedily schedule this matter for a preliminary injunction hearing.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
        *pro hac vice application pending*
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

 /s/ Jeremy M. Gay
Jeremy M. Gay
Advocate Law Center, P.A.
821 S. Ford Dr.
Gallup, New Mexico 87301
(505) 722-2055
Jeremy@alcpafirm.com

23

## CERTIFICATION OF SERVICE

Counsel for Defendants Grisham, Allen, Bowie, and Weisler have appeared in this matter. They have been served copies of this filing by the Court's CM/ECF filing system at the time of filing. Defendant Medina has not appeared and the undersigned will serve this filing by electronic mail:

Holly Agajanian, Esq.
Chief General Counsel – Office of Governor Michelle Grisham
    *For Defendants Grisham, Allen, Bowie, and Weisler*
State Capitol Building, Ste. 400
Santa Fe, NM 87501
Holly.agajanian@exec.nm.gov

Lauren Keefe, Esq.
City Attorney – City of Albuquerque
    *For Defendant Medina*
One Civic Plaza NW
4th Floor, Room 4072
Albuquerque, NM 87102
lkeefe@cabq.gov

/s/ Cameron L. Atkinson /s/