**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC,<br>DENNIS SMITH, | : | DKT No.: 1:23-cv-00773-DHU-LF |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELLE LUJAN GRISHAM,<br>in her official capacity only, PATRICK<br>M. ALLEN, in his official capacity only,<br>JASON R. BOWIE, in his official<br>capacity only, TROY WEISLER, in his<br>official capacity only, HAROLD<br>MEDINA, in his official capacity only, | : | |
| | : | |
| Defendants. | : | October 20, 2023 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL (RELIEF REQUESTED BY 5:00 PM, OCTOBER 23, 2023)**

The Court's October 11, 2023 order denying the Plaintiffs' motion for a preliminary injunction wades into a thorny doctrinal debate over originalism: whether the Second Amendment should be interpreted according to its 1791 meaning or a respoken 1868 meaning. Dkt. 27. The emergency nature of this case, however, deprived the Court and the parties of an opportunity to prepare detailed legal briefing on an issue that the Supreme Court decided to avoid after more than a thousand pages of briefing and months to consider it. The Plaintiffs respectfully submit that the Court's analysis – as careful as it was in the procedural posture of this case – overlooked critical language from *Heller*, *McDonald*, and *Bruen* that strongly demonstrate that the Second Amendment is

interpreted according to its 1791 meaning and that the debate is nothing more than it is until the Supreme Court says otherwise.

The Plaintiffs further submit that the Court unwittingly relieved the Defendants of their substantive burden under *Bruen* by holding that various city ordinances which adopted prohibitions on carrying firearms in public parks were probative of a national historical tradition of firearm restrictions at public parks within cities. Dkt. 27, pp. 17-18. *Bruen* requires a "well-established and representative" historical tradition, and the number of city ordinances in this case simply are not enough to show a "well-established and representative" historical tradition, particularly when their laws were immune from judicial scrutiny.

In light of the Defendants' emergency actions to disturb the status quo, the Plaintiffs respectfully ask the Court to preserve the status quo pending the resolution of these questions by the Tenth Circuit. In the alternative, they seek a stay pending their application for a stay from the Tenth Circuit.

## **FACTUAL BACKGROUND**

The Court is thoroughly familiar with the facts so the Plaintiffs provide only a brief background. In response to several isolated incidents of shootings, New Mexico officials promulgated a number of public health orders banning the public carrying of firearms in Albuquerque, New Mexico and Bernalillo County. After the Plaintiffs filed this action, the Defendants revised the orders to ultimately only ban the carrying of firearms in public parks and playgrounds. The Court issued a temporary restraining order on September 13, 2023 while it considered the Plaintiffs' motion for a preliminary injunction. It

subsequently denied the Plaintiffs' motion for a preliminary injunction on October 11, 2023.   The Plaintiffs have appealed the Court's denial of their motion for a preliminary injunction, and they submit this motion as a necessary prerequisite to seeking emergency relief from the Tenth Circuit.

## LEGAL STANDARD

The Court (Browning, J.) has previously issued a well-reasoned opinion on the standard for evaluating a motion for injunction pending appeal at the district court stage. *General Protecht Group, Inc. v. Leviton Mfg. Co., Inc.*, 2010 WL 5477266, at * 3 (D. N.M. 2010). In particular, "10th Cir. R. 8.1 requires the applicant to address ...: '(a) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay or injunction is not granted; (c) the absence of harm to opposing parties if the stay or injunction is granted; and (d) any risk of harm to the public interest." *Id*. at *3 (quoting *McClendon v. City of Albuquerque*, 79 F.3d 1014 (10th Cir. 1996)).

## ARGUMENT

I.      **The Plaintiffs Demonstrate A Substantial Likelihood Of Prevailing On The Merits.**

A. **The Court overlooked critical language from *Heller*, *McDonald*, and *Bruen* that makes 1791 history the controlling history in Second Amendment analysis.**

The Plaintiffs do not dispute that *Bruen* explicitly professed not to resolve the ongoing scholarly debate "on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111,

3

2137-38 (2022) (holding that the Supreme Court has generally assumed that Second Amendment's protection is grounded in the public understanding of the right as understood in 1791). Despite this explicit profession, the Supreme Court gave instructions about the methodology of historical analysis that demonstrate that the 1791 public understanding controls.

Start with *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Heller* expressly acknowledged the importance of public discourse on how to secure the right to bear arms for the newly freed slaves after the Civil War and characterized it as instructive. *Id.* at 614. It, however, cautioned that, "[s]ince those discussions took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."

Consider *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) next. *McDonald* emphatically rejects the proposition that a different standard governs when a provision of the Bill of Rights applies to the federal government versus when it applies to the states. *Id*. at 765. Instead, it reemphasized its longstanding rule that the incorporated provisions of the Bill of Rights "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id*. at 765 (internal quotation marks and citations omitted); *see also id*. at 766 n.14.

*Bruen* clarifies *Heller*'s language. It cautions courts "against giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S.Ct. at 2136. It then undertakes the task of reconciling *Heller* with this warning by acknowledging that evidence of "how

the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" is a "critical tool of constitutional interpretation," but establishing that post-ratification, 19th-century history must be "open, widespread, and unchallenged since the early days of the Republic…" in order to guide Second Amendment interpretation. *Id*. at 2136-37 (internal quotation marks and citations omitted). Thus, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 2137 (internal quotation marks and citations omitted). In other words, *Bruen* establishes, consistent with *Heller*, that 19th century evidence may only be "treated as mere confirmation" of the Second Amendment's meaning. *Id*. at 2137.

Despite its reservations regarding the scholarly debate, *Bruen* also imports *McDonald*'s reaffirmation of the well-established uniform standard for federal and state governments as a preface to recognizing the debate: "Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id*. at 2137.

Taken together, these principles and the uniform standard rule make the argument for a revised 1868 understanding of the Second Amendment untenable. Both *Heller* and *Bruen* expressly require courts to use post-enactment history in a confirmatory role rather than as a primary interpretative role. Both *Heller* and *McDonald* characterized 19th history between 1791 and 1868 and after 1868 as post-enactment history, establishing that the

enactment that their analyses are based on is the 1791 adoption of the Second Amendment.

As an original matter, the uniform standard rule presents even greater problems for the 1868 argument because it is grounded in an originalist understanding of the Fourteenth Amendment. A common misperception of abolitionist advocates prior to and after the Civil War was that the Bill of Rights did apply to the states despite *Barron v. Baltimore*, 32 U.S. 243 (1833). *See* Remarks of Rep. Robert Hale, 39th Cong. Globe 1064 (1866)  ("I have, somehow or other, gone along with the impression that there is that sort of protection thrown over us in some way, whether with or without the sanction of a judicial decision that we are so protected"). Representative John Bingham – the principal framer of the Fourteenth Amendment – argued though that the Fourteenth Amendment would "arm the Congress… with the power to enforce the bill of rights as it stands in the Constitution today. It hath that extent – no more." Cong. Globe, 39th Cong. 1088 (1866). No other representative or senator – to the best of the undersigned's knowledge – involved in the Fourteenth Amendment debates expressed a desire to incorporate a different meaning of the Bill of Rights against the states than that which already restrained the federal government.

Instead, the debate over the Fourteenth Amendment focused on why it was necessary. Rep. Bingham and Senator Jacob Howard declared that it was an absolute necessity in view of *Barron*. Its opponents such as Rep. Hale sought to defend a greater measure of state sovereignty. No one understood the Fourteenth Amendment to reshape the Second Amendment or any other provision of the Bill of Rights during its ratification

debates, and its principal sponsor – John Bingham – specifically disclaimed that it was anything more than a vehicle to override *Barron*. Thus, to the extent that it incorporated a public understanding of the Second Amendment and the Bill of Rights, it did so based on the original public understanding of it at the time it was ratified in 1791.

The uniform standard rule recognizes this history and binds courts to search for the original 1791 meaning of the Bill of Rights. *Heller*, *McDonald*, and *Bruen* each follow this analysis through their distinction between interpretative and confirmatory history. There is simply no support for the proposition that the Fourteenth Amendment revised the meaning of the Second Amendment or its relevant history in 1868.

While the Plaintiffs recognize that the Court found *National Rifle Association v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) and *Maryland Shall Issue v. Montgomery Co.*, 2023 WL 4373260 (D. Md. 2023) persuasive for its adoption of the 1868 argument, they submit to the Court that neither the Eleventh Circuit nor the District of Maryland engaged in a thorough analysis of the issue. Neither court searched the historical record surrounding the adoption of the Fourteenth Amendment or considered the statement of its drafter – John Bingham – that it was incorporating the Second Amendment as it was originally understood in 1791. Neither court grappled with the uniform standard rule. Both courts failed to address the specific principles of *Heller* and *Bruen* regarding the confirmatory nature of 19th century history. In sum, both courts reached their conclusion in short order rather than conducting a thorough inquiry into the evidence supporting either the 1791 argument or the 1868 argument. Thus, their persuasive weight is nominal at best.

In view of this history, the Plaintiffs have shown a substantial likelihood of success on the merits of their appeal because a much more thorough examination of history than that conducted by *Bondi* and *Maryland Shall Issue* demonstrates that 1791 history should control the analysis of their arguments. The Plaintiffs have already thoroughly briefed the virtually total absence of comparable regulations as to public parks and schools in their original briefs. The lack of any comparable regulations renders their chances of success on appeal substantially likely.

**B.** ***Bruen*** **requires sufficient examples show a well-established and representative historical tradition.**

Even assuming that 1868 history and its immediate aftermath is the appropriate history to rely on, the Plaintiffs submit that the Defendants did not meet their burden under *Bruen* to demonstrate "a well-established and representative historical analogue." *Bruen*, 142 S.Ct. at 2133. The Court relied on a tallying of the park regulations listed in *Koons v. Platkin*, 2023 WL 3478604 (D. N.J. 2023), *Antonyuk v. Hochul*, 639 F.Supp.3d 232 (N.D.N.Y. 2022), and *Maryland Shall Issue* to reach its conclusion that the Defendants "may be able to demonstrate a national historical tradition of firearm restrictions at public parks within cities…." Dkt. 27, p. 18. In particular, it gave great weight to three states that prohibited the carrying of firearms at public parks not long after the ratification of the Fourteenth Amendment, relying on *Maryland Shall Issue*. *Id*. at p. 17-18.

*Maryland Shall Issue* though led the Court into error because it ignored *Bruen* in several ways. First, the majority of the laws that it lists as prohibiting carrying of firearms in state parks were enacted decades after the Fourteenth Amendment was adopted. *See Maryland Shall Issue*, 2023 WL 4373260 at *11 (compiling laws). In particular, it only cited

8

three laws by the undersigned's count – all municipal – that were enacted prior to 1890. *Id*. Only one of the state laws that it cited (Michigan – 1895) was enacted prior to 1900. *Id*.

*Koons* and *Antonyuk* served the Court no better. *Koons* could only locate one state law and about 25 local ordinances enacted by 1890 governing "less than 10% of the nation's entire population" and declared such a number to be insufficient to establish a representative historical tradition. *Koons*, 2023 WL 3478604 at *85. Likewise, *Antonyuk* held that a percentage of less than 15% would not be sufficiently representative of the nation's historical tradition. *Antonyuk*, 639 F.Supp.3d at 326.

To the extent that these three decisions relied on laws that come after 1890, they err. *Bruen* specifically warned courts against reaching too far into the past or future: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years" *Bruen*, 142 S.Ct. at 2136. Reaching past 1890 commits precisely that error.

Additionally, courts must take any history that comes after 1875 with a grain of salt. The Supreme Court declined to incorporate the Second Amendment against the states in *United States v. Cruikshank*, 92 U.S. 542 (1875). Thus, any laws enacted after 1875 that restricted the right to carry firearms in any location were completely shielded from Second Amendment scrutiny until the Supreme Court reversed course in *McDonald*. Those laws are simply not probative of the Second Amendment's meaning.

9

The Defendants' failure to supply sufficient laws and the similar failure of *Maryland Shall Issue* deprives the Court's decision of the necessary foundation it needs to withstand appeal. To that end, the Plaintiffs are substantially likely to prevail on appeal.

## II.     The Plaintiffs Demonstrate Irreparable Harm In The Absence Of An Injunction Pending Appeal.

Plaintiffs demonstrate irreparable harm "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). The Plaintiffs carry their burden on this prong.

As discussed above, the Second and Fourteenth Amendments guarantee a right to publicly carry firearms for lawful purposes. The Defendants have issued orders that completely bar the Plaintiffs from exercising those rights in New Mexico public parks and playgrounds in violation of the Second and Fourteenth Amendments for the next 30 days. Their injury is thus immediate and ongoing. *See Elrod v. Burns* 427 U.S. 347, 373 (1976) (establishing a presumption of harm for the loss of constitutional freedoms).

Plaintiff Smith, however, still intends to exercise his rights despite the Defendants' orders. If he does, he and other similarly situated members of We The Patriots USA, Inc. will face crippling financial sanctions, arrest, and criminal prosecution. In other words, the collective burden of the Defendants' enforcement of their unconstitutional orders will speedily end Smith's determination to exercise his Second Amendment rights.

Monetary damages would constitute an inadequate remedy and would be extremely difficult to ascertain. The very essence and value of a constitutional right is the ability to exercise it uninhibited within the constitutionally permissible bounds established

by law, not executive fiat. Thus, a day where the Plaintiffs cannot exercise their constitutional rights without violating the law or exposing themselves to crippling financial sanctions is a day lost to them forever. No amount of money cannot adequately compensate them for days where they could not exercise their constitutional rights. More importantly, monetary damages would be completely unavailable as to the Defendants if the Plaintiffs suffered death or serious injury at the hands of a gun-wielding criminal while the Defendants barred them from lawfully carrying firearms.

Additionally, there is no way to reliably determine what monetary damages to award the Plaintiffs for the loss of their constitutional rights. A jury would simply have to pull a number out of their hats, and that number could be astronomically high or nominal depending on their sympathies. Thus, the Court should conclude that the Plaintiffs have demonstrated irreparable harm and find that this factor weighs in favor of granting a stay pending an appeal.

III.    **The Plaintiffs Demonstrate That The Threatened Harm Outweighs Any Damage That The Injunction Pending Appeal May Cause To The Party Opposing It.**

The Defendants will suffer no damage by the granting of an injunction pending appeal. Prior to the Defendants' issuance of their orders, Smith and other similarly situated, law-abiding New Mexico citizens carried their firearms regularly in public parks and playgrounds. They represented no threat to public safety or the public health then, and nothing about their conduct has changed to render them a threat to public safety now.

Additionally, nothing about their behavior will change in the next 30 days to render them more responsible to carry firearms in public. No important public health goals will

be served by prohibiting law-abiding citizens from exercising their Second Amendment rights in a law-abiding manner.

The Defendants' amended order also opens fire on its own logic. It still permits the Plaintiffs to carry their firearms in state parks and playgrounds outside the City of Albuquerque and Bernalillo County. If these locations truly were "sensitive places," the Defendants' failure to extent their order to those locations outside the City of Albuquerque and Bernalillo County is baffling.

The Defendants have grounded their rationale for issuing their orders in nothing extraordinary. Crime happens. While the loss of any life is tragic, the Defendants' reliance on three isolated shootings – the result of criminal conduct – does not establish a broader societal problem that imperils New Mexico citizens as a community. Every city and state in the United States experience shootings and murders, but they still permit their law-abiding citizens to bear arms just as New Mexico did until the Defendants reacted emotionally and unilaterally.

The problems that the Defendants seek to address will not disappear as long as human beings coexist in communities. As discussed at length above, the Supreme Court has already recognized these problems, but it has affirmed the superseding importance of the right to publicly carry firearms. Thus, the Court's issuance of an injunction pending appeal will not cause any harm to the Defendants who will simply be returned to the same circumstances that every state and city in the United States exists in.

**IV.    The Plaintiffs Demonstrate That The Injunction Will Not Be Adverse To The Public Interest.**

*Bruen*'s plain language controls the final factor in the temporary restraining order/preliminary injunction analysis: "The Second Amendment is the very *product* of an interest balancing by the people, and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal quotation marks and citations omitted, emphasis in original). Thus, "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Id*. This language alone is dispositive of this factor. Thus, the Second Amendment's protection of a right to public carry supersedes the interests that the Defendants have relied on in banning it.

There is more to the analysis though. The Defendants do not act under the color of a duly enacted state law or legislative action. They amended their ban late at night when the courts closed their doors for business, and they thought no one would pay heed to their actions. They solicited no public comment, and they completely disregarded any constitutional limitations on their conduct. In other words, the Defendants' conduct does not carry the weight of a carefully calculated legislative judgment, but rather the emptiness of a panicked late-night decision to impose an absolute deprivation of a constitutional right on countless law-abiding New Mexico citizens.

Thus, the absence of any carefully articulated public interest and the strength of the Second Amendment's interest balancing leads to one conclusion: The public interest favors the issuance of an injunction pending appeal.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that the Court issue

an injunction pending appeal or, in the alternative, a stay pending their application for a

stay with the Tenth Circuit.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
        *admitted pro hac vice*
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

 /s/ Jeremy M. Gay
Jeremy M. Gay
Advocate Law Center, P.A.
821 S. Ford Dr.
Gallup, New Mexico 87301
(505) 722-2055
Jeremy@alcpafirm.com

## CERTIFICATION OF SERVICE

Counsel for Defendants Grisham, Allen, Bowie, and Weisler have appeared in this matter. They have been served copies of this filing by the Court's CM/ECF filing system at the time of filing. Defendant Medina has not appeared and the undersigned will serve this filing by electronic mail:

Holly Agajanian, Esq.
Chief General Counsel – Office of Governor Michelle Grisham
    *For Defendants Grisham, Allen, Bowie, and Weisler*
State Capitol Building, Ste. 400
Santa Fe, NM 87501
Holly.agajanian@exec.nm.gov

Lauren Keefe, Esq.
City Attorney – City of Albuquerque
    *For Defendant Medina*
One Civic Plaza NW
4th Floor, Room 4072
Albuquerque, NM 87102
lkeefe@cabq.gov

/s/ Cameron L. Atkinson /s/
