IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WE THE PATRIOTS USA, INC., *et al.*,

    Plaintiffs,

v.                                            No. 1:23-cv-00773-DHU-LF

MICHELLE LUJAN GRISHAM, *et al.*,       Consolidated with:

    Defendants.                            No. 1:23-cv-00771-DHU-LF
                                                      No. 1:23-cv-00772-DHU-LF
                                                      No. 1:23-cv-00774-DHU-LF
                                                      No. 1:23-cv-00778-DHU-LF
                                                      No. 1:23-cv-00839-DHU-LF

**DEFENDANTS' COMBINED RESPONSE TO PLAINTIFFS'
MOTIONS FOR INJUNCTION PENDING APPEAL**

    Defendants Governor Michelle Lujan Grisham, Secretary Patrick M. Allen, Secretary Jason R. Bowie, and Chief Troy W. Weisler (collectively, Defendants), by and through their counsel of record, hereby submit their response to Plaintiffs' Emergency Motions for Injunction Pending Appeal (collectively, Motions) [Docs. 37 and 41]. Defendants request the Court deny the motions for the reasons set forth herein.

**Introduction and Background**

    Having only recently emerged from a global pandemic, New Mexico finds itself in the midst of another public health crisis. In 2021, the last year for which complete data is available from the Centers for Disease Control and Prevention, New Mexico's gun death rate was the third highest in the nation.[1] In a single twelve-month period, firearm related emergency room visits

---

[1] *See Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico*, at 5, N.M. Dep't of Health (Sept. 28, 2023), https://www.nmhealth.org/publication/view/report/8462/.

increased 77% for males aged 0-13, 115% for females aged 14-17, and 32% for males aged 14-17. *See id.* Since 2017, firearm death rates have increased by 91% for American Indian/Alaska Native residents, 78% for Hispanic residents, and 47% overall. *Id.* Staggeringly, New Mexico's firearm injury death rate is 90% higher than the national average. *Id*.

One need look no further than local news coverage to witness the tragic effects of this crisis. On September 6, 11-year-old Froylan Villegas, along with his mother, baby brother, and cousin were returning home from an evening at the Isotopes game when seventeen bullets tore through their car.[2] At least one of those bullets struck Froylan, killing him; another seriously injured his cousin. *See id.* Unfortunately, this is only one example of how gun violence is destroying the lives of New Mexicans, including children.[3]

Governor Michelle Lujan Grisham has made significant efforts to address gun violence during her term in office, including championing public health and safety legislation, convening task forces, and increasing funding for public safety.[4] But the terrible events described above

---

[2] Alexa Skonieski, *Family, friends grieve 11-year-old shot, killed while leaving Isotopes Park*, KRQE News (Sept. 12, 2023), https://www.krqe.com/news/albuquerque-metro/family-friends-remember-11-year-old-shot-killed-while-leaving-isotopes-park/.

[3] *See, e.g.*, Aliza Chasan, *14-year-old boy, dad arrested after teen allegedly used father's gun to kill teenage girl in New Mexico*, CBS News (July 30, 2023), https://www.cbsnews.com/news/teen-father-arrested-girl-shot-killed-gun-police-assault-questa-new-mexico/; *APD charges 4 teens for drive-by shooting that killed 5-year-old girl*, KOB News (Aug. 21, 2023), https://www.kob.com/new-mexico/apd-charges-4-teens-for-drive-by-shooting-that-killed-5-year-old-girl/; Jessica Salinas, *Albuquerque mom accused of shooting 7-year-old accused in other abuse cases*, KRQE News (Sept. 22, 2023), https://www.krqe.com/news/albuquerque-metro/albuquerque-mom-accused-of-shooting-7-year-old-accused-in-other-abuse-cases/.

[4] *See, e.g.*, Press Release, *Governor delivers over $40 million for new police officers across New Mexico*, Office of Gov. Michelle Lujan Grisham (Sept. 9, 2022), https://www.governor.state.nm.us/2022/09/09/governor-delivers-over-40-million-for-new-police-officers-across-new-mexico/; Press Release, *Gov. Lujan Grisham priority legislation effective today*, Office of Gov. Michelle Lujan Grisham (June 16, 2023), https://www.governor.state.nm.us/2023/06/16/gov-lujan-grisham-priority-legislation-effective-today/; Press Release, *Governor establishes ERPO task force*, Office of Gov. Michelle Lujan

deprived the Governor of luxury of time to wait and see these efforts yield results. And so the Governor took more immediate action and issued Executive Orders 2023-130 and 2023-132 invoking her powers under the All Hazard Emergency Management Act (AHEMA), NMSA 1978, §§ 12-10-1 to -10 (2007), and declaring a state of public health emergency due to gun violence and drug abuse pursuant to the Public Health Emergency Response Act (PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015).[5]

Shortly thereafter, Department of Health Secretary Patrick Allen issued a public health emergency order imposing broad restrictions on the possession of firearms in cities and counties with high levels of gun violence and implementing various other measures meant to reduce gun violence and drug abuse (the "PHO").[6] Plaintiffs filed federal lawsuits seeking preliminary and permanent injunctive relief to bar enforcement of the PHO, primarily arguing it infringed upon their Second Amendment rights. *See Nat'l Ass'n for Gun Rights v. Lujan Grisham*, 2023 WL 5951940 (D.N.M. Sept. 13, 2023). On September 13, 2023, this Court granted Plaintiffs' requests for a temporary restraining order enjoining the Governor and Secretary Allen from enforcing the PHO "to the extent it imposes additional restrictions on the carrying or possession of firearms that were not already in place prior to its issuance." *Id.* at *5. Two days later, Secretary Allen amended the PHO to, *inter alia*, remove the broad prohibition on the carrying of firearms in Albuquerque

---

Grisham (Aug. 26, 2022), https://www.governor.state.nm.us/2022/08/26/governor-establishes-erpo-task-force/.

[5] *Executive Order 2023-130*, Gov. Michelle Lujan Grisham (Sept. 7, 2023), https://www.governor.state.nm.us/wp-content/uploads/2023/09/Executive-Order-2023-130-1.pdf; *Executive Order 2023-132*, Gov. Michelle Lujan Grisham (Sept. 8, 2023), https://www.governor.state.nm.us/wp-content/uploads/2023/09/Executive-Order-2023-132.pdf.

[6] *Public Health Order*, N.M. Dep't of Health (Sept. 8, 2023), https://cv.nmhealth.org/wp-content/uploads/2023/09/090823-PHO-guns-and-drug-abuse.pdf.

and Bernalillo County and replace it with a narrow provision restricting firearms in public parks, playgrounds, and "other public areas provided for children to play in."[7] On October 5, 2023, the Governor renewed the states of public health emergency pursuant to Section 12-10A-5(D)(2).[8] The following day, Secretary Allen amended the PHO to, among other things, clarify the scope of its firearm restrictions and remove the restriction of firearms in "other public areas provided for children to play in."[9]

The PHO's narrowed restrictions on firearms were again immediately challenged as violating the Second Amendment. *See We the Patriots, Inc. v. Lujan Grisham*, 2023 WL 6622042 (D.N.M. Oct. 11, 2023). On October 11, 2023, this Court issued a memorandum opinion and order denying a preliminary injunction against the October 6 PHO's restrictions on the possession of firearms in public parks and playgrounds. *See We the Patriots*, 2023 WL 6622042, at *1. On October 19, 2023, Plaintiffs We the Patriots USA, Inc. and Dennis Smith filed a notice of interlocutory appeal to the United States Court of Appeals for the Tenth Circuit. [Doc. 31] Plaintiffs Zachary Fort, Firearms Policy Coalition, Inc., Second Amendment Foundation, and New Mexico Shooting Sports Association, Inc. also filed a notice of appeal the following day. [Doc.

---

[7] *Public Health Order*, N.M. Dep't of Health (Sept. 15, 2023), https://cv.nmhealth.org/wp-content/uploads/2023/09/NMAC-EO-2023-130-132-Amended.pdf.

[8] *Executive Order 2023-135*, Gov. Michelle Lujan Grisham (Oct. 5, 2023), https://www.governor.state.nm.us/wp-content/uploads/2023/10/Executive-Order-2023-135.pdf; *Executive Order 2023-136*, Gov. Michelle Lujan Grisham (Oct. 5, 2023), https://www.governor.state.nm.us/wp-content/uploads/2023/10/Executive-Order-2023-136.pdf. The Governor most recently renewed the state of public health emergency on November 3, 2023. Although the most recent executive orders have not yet been posted online due to technical issues, they will be posted on the following website next week: https://www.governor.state.nm.us/about-the-governor/executive-orders/.

[9] *Public Health Order*, N.M. Dep't of Health (Oct. 6, 2023), https://cv.nmhealth.org/wp-content/uploads/2023/10/NMAC-PHO-20231006-Amended.pdf.

33] That same day, Plaintiffs We the Patriots and Smith filed a motion for injunction pending appeal, requesting the same relief this Court denied. [Doc. 37] One week later, Plaintiffs Fort, Firearms Policy Coalition, Second Amendment Foundation, and New Mexico Shooting Sports Association filed a motion seeking the same relief. [Doc. 41]

The Court should deny the Motions. At the outset, Plaintiffs still lack standing to challenge the PHO because the City of Albuquerque already prohibits firearms in parks and playgrounds. Plaintiffs also fail to demonstrate a substantial likelihood of success on the merits of their challenge to the PHO. As this Court has already preliminarily determined, the government may constitutionally prohibit firearms in playgrounds, which are analogous to sensitive locations such as schools that the Supreme Court recognizes are excepted from the Second Amendment's commands. The same goes for the temporary restriction on firearms in parks given the historical tradition of comparable regulations. Lastly, Plaintiffs cannot demonstrate any form of harm, let alone irreparable harm, stemming from the PHO.

## **Argument & Authorities**

### I. **Plaintiffs do not have standing to enjoin the PHO's restrictions on parks and playgrounds**

Plaintiffs in federal civil actions must demonstrate standing for each form of relief sought. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). While the Court previously found that Plaintiffs demonstrated standing because they indicated they intended to visit parks and playgrounds with firearms, it did not address Defendants' previous argument that a favorable

decision would not redress Plaintiffs' purported injuries because the City of Albuquerque already prohibits such conduct. *See We the Patriots*, 2023 WL 6622042, at **5-6; *see, e.g.*, [Doc 21 in 23-CV-00771 at 13-14].[10] For this reason, Plaintiffs still lack standing to enjoin the PHO.[11] *See Valdez v. Lujan Grisham*, 2022 WL 2129071 (10th Cir. 2022) (noting that even if injunction were granted to prohibit enforcement of state vaccine mandate for hospital workers, the plaintiff was still required to be vaccinated under federal law, and thus her "injury . . . is not redressable by enjoining the PHO").

## II. Plaintiffs are not entitled to an injunction pending appeal

### A. Standard of review

Rule 8(a)(1) of the Federal Rules of Appellate Procedure provides that "[a] party must ordinarily move first in the district court for . . . an order . . . granting an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(A), (C). A Rule 8(a) motion for an injunction pending appeal "is subject to the exact same standards" as that applicable to a motion for a preliminary injunction, *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015). Accordingly, to obtain a stay pending appeal, the moving party must prove four things: (1) "that she's substantially likely to succeed on the merits"; (2) "that she'll suffer irreparable injury if the court denies the injunction"; (3) "that her threatened injury (without the injunction) outweighs the opposing party's under the injunction"; and (4) "that the injunction isn't adverse to the public interest." *Free the Nipple-Fort Collins v.*

---

[10] Defendants do not fault the Court for this, as this argument was not contained under Defendants' standing argument section.

[11] Although Plaintiffs' counsel states that "Plaintiff Fort Plaintiff Fort wishes to carry firearms in parks in Bernalillo County that lie outside the city limits (to which the Albuquerque ordinance prohibiting carry firearms in City parks does not apply)[,]" [Doc. 41 at 6] they do not provide any evidentiary support for this assertion or identify any specific park Fort wishes to visit in Bernalillo County that lies outside of city limits. The Court should not accept this unsupported and generalized assertion.

*City of Fort Collins*, Colo., 916 F.3d 792, 797 (10th Cir. 2019) (citation omitted). "A Rule 8(a) motion for an order granting an injunction while an appeal is pending 'demands a significantly higher justification than a request for a stay because, unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by the court.'" *Valdez v. Lujan Grisham*, 2021 WL 8993798, at *1 (D.N.M. Oct. 7, 2021) (alterations omitted) (quoting *South Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring). "This power is used where the legal rights at issue are indisputably clear and, even then, sparingly and only in the most critical and exigent circumstances." *Id.* (quoting *South Bay*, 140 S. Ct. 1613).

> **B.    Plaintiffs fail to demonstrate a substantial likelihood of success on the merits**

Even if Plaintiffs could establish standing to challenge the PHO, they cannot demonstrate that they are likely to succeed in challenging the PHO's restrictions on firearms in parks and playgrounds. In *Bruen*, the United States Supreme Court adopted a new two-part test for Second Amendment claims, in which courts would first ask "whether the Second Amendment's plain text covers an individuals' conduct" and, if so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. This inquiry considers whether there is "historical precedent" from before, during, and after the enactment of the Second and Fourteenth Amendments that "evinces a comparable tradition of regulation" in a similar manner as the present-day restriction. *Id.* at 2131, 2137-38.

For many modern-day firearm regulations, this analysis will require "reasoning by analogy." *Id.* at 2130, 2132. Two primary metrics are relevant for determining whether a modern regulation is "relevantly similar" to a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. "[W]hether modern and

7

historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'central'" considerations when engaging in an analogical inquiry." *Id.* at 2133. But the Court has made it "clear" that analogical reasoning under the Second Amendment is not "a regulatory straightjacket" and "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* (internal quotation marks and citations omitted)). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

One category of laws the Supreme Court identified that courts could examine to determine whether modern regulations prohibiting the carry of firearms are constitutionally permissible is "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* (quoting *D.C. v. Heller*, 554 U.S. 570, 626 (2008)). While there were "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," the Court was not aware of any disputes regarding the lawfulness of such prohibitions, and therefore "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. Thus, "courts can use analogies to [these] historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.*

Here, the PHO's restriction on carrying firearms in playgrounds is constitutionally permissible because they are analogous to schools—a location which the Supreme Court has specifically deemed to be a "sensitive place" where carrying firearms could be prohibited consistent with the Second Amendment. *See id*. As this Court and other district courts have held, "playgrounds are often associated with schools and therefore the inference that they are sensitive

8

places under *Bruen* is appropriate." *We the Patriots*, 2023 WL 6622042, at *10 (citing *Siegel v. Platkin*, 2023 WL 1103676, at *10 (D.N.J. Jan. 30, 2023)). This is because both locations typically contain a "vulnerable population" that are unable to defend themselves or exercise Second Amendment rights of their own (i.e., children). *See id.*; *see also Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 324 (N.D.N.Y. 2022) (finding that ban on firearms in playgrounds "finds support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children"), *reconsideration denied sub nom. Antonyuk v. Nigrelli*, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022); *Maryland Shall Issue*, 2023 WL 4373260, at *9 (finding childcare facilities analogous to schools because and noting that "prohibitions on firearms in both schools and childcare facilities are meant to protect the same or similar vulnerable populations, consisting of students and children"). Accordingly, the PHO's provisions banning firearms possession in playgrounds is constitutional.

The same goes for the PHO's restriction of firearms in parks. In *Mayland Shall Issue*, the court addressed this very issue. In determining whether there was a history of restricting firearm possession and carrying in public parks, the court identified dozens of state and local regulations restricting the possession or carry of firearms in public parks or their historical analogues, including firearm bans in parks in the five largest cities in the United States. *Id*. at *11. The court explained: "As to public parks, numerous historical statutes and ordinances from the time period before and following the ratification of the Fourteenth Amendment imposed such restrictions in relation to parks." *Id*. The court identified examples of prohibiting gun carrying in parks in Central Park in New York City and Fairmount Park in Philadelphia, Pennsylvania; as well as parks in Detroit, Michigan; Chicago, Illinois; Saint Paul, Minnesota; Williamsport, Phoenixville, and Reading, Pennsylvania; Boulder, Colorado; Wilmington, Delaware; Trenton, New Jersey;

9

Oakland, California; Staunton, Virginia; and Birmingham, Alabama. *Id.* The court also identified similar statewide laws in Minnesota, Wisconsin, and North Carolina. *Id.* Ultimately, the court concluded, "[t]hese laws which . . . categorically bar the carrying of firearms in parks, demonstrate that there is 'historical precedent' from before, during, and after the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms in parks." *Id.* (quoting *Bruen*, 142 S. Ct. at 2131-32).

In addition to the laws cited by the court in *Mayland Shall Issue*, Defendants point out that New Mexico itself had a law making it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any settlements of this Territory" unless they were threatened with imminent danger of an attack on themselves, family or property, 1869 Terr. of N.M. Laws ch. 32, § 1, Arizona prohibited "the carrying of firearms in any 'place where persons are assembled for amusement or for educational or scientific purposes,'" and Oklahoma prohibited firearms in any place "where persons are assembled . . . for amusement, or for educational or scientific purposes." *Antonyuk*, 639 F. Supp. 3d at 323.[12] Texas similarly prohibited firearms in numerous public venues and social gatherings. *See* 1871 Texas Gen. Laws ch. 34, § 1.[13] And Missouri enacted a law in 1883 "prohibiting the carrying of firearms in places where

---

[12] Although *Bruen* discounted the impact of territorial restrictions on firearms, subsequent research and legal analysis has suggested that because territories were subjected to the Second Amendment well before the Fourteenth Amendment made it applicable to the states, this approach may have been short-sighted. *See Atkinson v. Garland*, 70 F.4th 1018, 1036 (7th Cir. 2023); Andrew Willinger, *The Territories Under Text, History and Tradition*, 101 Wash. U. L. Rev. 1, 13-21 (2023).

[13] The Supreme Court of Texas upheld the law, finding arguments to the contrary "little short of ridiculous." *English v. State*, 35 Tex. 473, 476 (1871). While the Court in *Bruen* declined to rely on this Texas law and the reasoning in *English* because it "'contradict[ed] the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public[,]" 142 S. Ct. at 2153 (quoting *Heller*, 554 U.S. at 632), the Court did not speak to its persuasive value in

10

people are assembled for 'educational, literary or social purposes' and 'any other public assemblage of persons met for any lawful purpose.'" *Antonyuk*, 639 F. Supp. 3d at 323. These broader territorial and state laws buttress the conclusion that a narrower restriction on firearms in parks in New Mexico's most-populated city and county is supported by the historical record.

This Court reached the same conclusion as the court in *Mayland Shall Issue*. In so holding, the Court recognized that two other district courts reached an opposite conclusion. *See We the Patriots*, 2023 WL 6622042, at **7-8 (citing *Antonyuk*, 639 F. Supp. 3d 232, and *Koons v. Platkin*, 2023 WL 3478604 (D.N.J. May 16, 2023)). However, the Court observed, the *Antonyuk* court discounted the myriad local ordinances—which the *Antonyuk* court found arguably "support a historical tradition of banning firearms in public parks in a city (where the population density is generally higher)"—because it was examining a law prohibiting firearms in parks throughout the state (unlike the PHO here). *Antonyuk*, 639 F. Supp. 3d at 325; *see We the Patriots*, 2023 WL 6622042, at *8. And while the *Koons* court acknowledged there were "many laws—mostly local ordinances—from the 19th and 20th centuries restricting firearms at parks," the court ignored many of these laws and found the remaining laws insufficient simply because "they governed less than 10% of the nation's entire population." *Koons*, 2023 WL 3478604, at **82-85. But this overly simplistic conclusion based on population alone finds little to no support in *Bruen*.[14] The *Koons* court also erroneously discounted these laws because there were no colonial era laws prohibiting firearms in parks. *See* 2023 WL 3478604, at **82-84. But this has no bearing here because "parks

---

determining whether there is a historical tradition of prohibiting firearms in certain locations such as parks.

[14] *See* Andrew Willinger, *Litigation Update: Antonyuk Round 3; Judge Grants Preliminary Injunction of Large Portions of New York's Post-Bruen Law*, Duke Ctr. For Firearms L. (Nov. 18, 2022), https://firearmslaw.duke.edu/2022/11/litigation-update-antonyuk-round-3-judge-grants-preliminary-injunction-of-large-portions-of-new-yorks-post-bruen-law/.

around 1791 were not comparable to modern parks." *Wolford v. Lopez*, 2023 WL 5043805, at *21 (D. Haw. Aug. 8, 2023); *see also Kipke v. Moore*, 2023 WL 6381503, at *9 (D. Md. Sept. 29, 2023) (stating that "not only were there few parks at that time, but these parks did not resemble the modern, expansive State and federal park system that the United States has today").

Ultimately, this Court correctly concluded, "[w]hen all of the laws and ordinances cited by *Antonyuk*, *Koons*, and *Maryland Shall Issue* are combined and tallied, it appears plausible, although not certain, that Defendants may be able to demonstrate a national historical tradition of firearm restrictions at public parks within cities." *We the Patriots*, 2023 WL 6622042, at *9. Thus, the plaintiffs failed to demonstrate that their right to a preliminary injunction was "clear and unequivocal." *Id.* (quoting *Diné Citizens*, 839 F.3d at 1281).

Plaintiffs give the Court no good reason to revisit this conclusion. Plaintiffs argue that the Court erred in recognizing "historical sources from the period of the ratification of the Fourteenth Amendment in 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era." *Id.* at *8 (citing *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), *reh'g en banc granted, opinion vacated*, *Nat'l Rifle Ass'n v. Bondi*, 72 F.4th 1346 (11th Cir. 2023)). [Doc. 41 at 3-4] The Court got it right. As it explained, "this is so '*because* the Fourteenth Amendment is what caused the Second Amendment to apply to the States, [thus] the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters.'" *Id.* (quoting *Bondi*, 61 F.4th 1317); *see also Bruen*, 142 S. Ct. at 2138 (acknowledging "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" and citing law review article stating that "[w]hen the people adopted the Fourteenth Amendment into

12

existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings"). Regardless, this "1791 vs. 1868" debate only matters if the public understanding of the right to keep and bear arms at those times differ, *see id.*, and that is not the case with urban parks because "parks around 1791 were not comparable to modern parks." *Wolford*, 2023 WL 5043805, at *21.

Plaintiffs next urge this Court to change course and follow the district courts in *Antonyuk* and *Koons*. [Doc. 41 at 4-5] But these decisions have been stayed pending appeal—indicating that the Second and Third Circuits disagree with their conclusions. *See Antonyuk v. Hochul*, 2022 WL 18228317, at *1 (2d Cir. Dec. 7, 2022) (granting stay of preliminary injunction after having "weighed the applicable factors" (citing *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007); Order, *Koons v. Att'y Gen. of N.J.*, No. 2023-CV-16164 (3d Cir. June 20, 2023) (granting stay of preliminary injunction against restriction on firearms in parks "because the applicable factors warrant such a stay" (citing *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015)).

Plaintiffs also cite to *Wolford*, 2023 WL 5043805, which rejected the Maryland district court's conclusion simply because some of the laws were enacted after the ratification of the 14th Amendment.[15] [Doc. 41 at 5]. But *Bruen* does not require courts to ignore laws passed after 1868—especially when they were passed shortly after that time and do not contradict earlier evidence. *See* 142 S. Ct. at 2154 & n.28; *accord Vincent v. Garland*, 80 F.4th 1197, 1203 (10th Cir. 2023) (stating that the court will consider "the interpretation of the Second Amendment from its ratification *through the end of the nineteenth century*" (emphasis added)); *Antonyuk*, 639 F. Supp.

---

[15] The Ninth Circuit has not yet had the opportunity to opine on the district court's decision in *Wolford*. *See generally Wolford v. Lopez*, Nos. 23-16094, 23-16164.

3d at 255 n.4 (recognizing that laws from the "decades" immediately before and after 1791 and 1868 are probative because they "are the approximate periods in which there lived the state and federal legislators who ratified the Second and Fourteenth Amendments by a three-fourths majority as well as the people who chose those legislators"). The Hawaii district court's opinion also suffered from many of the same flaws and distinguishing features discussed above with regard to *Antonyuk* and *Koons*.

Lastly, Defendants note that another district court judge has reached the same conclusion as the one in *Maryland Shall Issue*. *See Kipke*, 2023 WL 6381503, at **9-10. In rejecting similar arguments Plaintiffs now put forward, the *Kipke* Court explained:

> State Defendants have shown that SB 1's restriction on firearms in parks is consistent with historical firearm regulation. Very few public parks existed at the time the Second Amendment was ratified, and those that did exist were typically located in cities. Plaintiffs thus argue that because these parks existed and were not regulated, there is no historical tradition of regulation in parks. Their argument misses the mark for several reasons. First, Plaintiffs point to just a handful of parks in existence at the time of the founding such as Boston Common and New York's City Hall Park. The Court cannot infer that parks were historically not regulated from so few places. Further, not only were there few parks at that time, but these parks did not resemble the modern, expansive State and federal park system that the United States has today. Boston Common, for example, "was used primarily as a pasture, a place of execution, and site for the militia to muster and drill." Notably, it was not completely unregulated, and militia were prohibited from "coming to muster with a loaded firearm."
>
> The historical record further shows that as States and cities created more parks, they also imposed firearm regulations. Around the time the Fourteenth Amendment was ratified, several jurisdictions prohibited firearms in public parks, including: New York City; Philadelphia; Chicago; St. Louis; and Boston. . . . Lastly, the Court finds that SB 1's public park ban imposes the same burden on the right to armed self-defense as these historical statutes, and the laws are comparably justified by the need for public safety. Accordingly, the Court finds that Plaintiffs are unlikely to succeed in their challenge of SB 1's prohibition on firearms in parks.

2023 WL 6381503, at **9-10 (citations and footnote omitted). Second Amendment experts have praised the Kipke court's analysis as more "cohesive" than the "mathematical equations" used by

the *Antonyuk*, *Koons*, and *Wolford* courts.[16] Thus, if anything, this Court should be more convinced Plaintiffs will not ultimately prevail on the merits of their Second Amendment challenge.

### C.  Plaintiff cannot demonstrate any harm, much less *irreparable* harm

The Court should also deny the Motions for failure to establish an injury, let alone an *irreparable* one. As discussed earlier, the City of Albuquerque already prohibits Plaintiffs from carrying a firearm in parks and playgrounds. Thus, Plaintiffs cannot demonstrate that they will be injured *at all* by enforcement of the PHO. And even if the City of Albuquerque did not already prohibit firearms in parks and playgrounds, Plaintiff cannot demonstrate any *irreparable* harm. Plaintiff's "harm" of not being able to protect themselves while at parks and playgrounds without his gun depends on unsupported speculation that they will be attacked while at those locations. This is insufficient. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." (internal quotation marks and citation omitted)). And Plaintiffs' cannot rely on their purported constitutional injuries given their failure to demonstrate a substantial likelihood of success on the merits of their claims. *See Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016) ("[A] plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." (citing *Schrier*, 427 F.3d at 1266)). Therefore, the Motions should be denied.

### Conclusion

For the foregoing reasons, the Court should deny Plaintiff's emergency motions for injunction pending appeal.

---

[16] *See* Andrew Willinger, *Litigation Highlight: Federal Judge Weighs Maryland's Post-Bruen Sensitive Places Law*, Duke Ctr. For Firearms L. (Oct. 18, 2023), https://firearmslaw.duke.edu/2023/10/litigation-highlight-federal-judge-weighs-marylands-post-bruen-sensitive-places-law/.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

SERPE ANDREWS, PLLC

*/s/ Cody R. Rogers*
Cody R. Rogers
2540 El Paseo Road, Suite D
Las Cruces, NM 88001
(575) 288-1453
crogers@serpeandrews.com

*Counsel for Governor Michelle Lujan Grisham, Secretary Patrick M. Allen, Secretary Jason R. Bowie* and *Chief W. Troy Weisler*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2023, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Cody R. Rogers*
Cody R. Rogers